PSH

UNSEALED KCM 9/17/13

FILED
13 SEP 12 PM 2:14

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | Case No.: **13MJ3456** |
|---|---|
| Plaintiff, | **COMPLAINT** |
| v. | |
| LEONARD GLENN FRANCIS (1), and JOHN BERTRAND BELIVEAU II (2), | Title 18, U.S.C., Sec. 371 – Conspiracy to Commit Bribery |
| Defendants. | |

The undersigned complainant being duly sworn states:

Beginning no later than on or about March 4, 2011, and continuing up to September 2013, defendants LEONARD GLENN FRANCIS and JOHN BERTRAND BELIVEAU II, and others, did knowingly and unlawfully conspire to commit bribery, in violation of Title 18, United States Code, Section 201(b)(1)(C), with such offense begun or committed outside any particular district; all in violation of Title 18, U.S. Code, Section 371.

The complainant states that this complaint is based on the attached statement of facts, which is incorporated herein by reference.

James McWhirter, Special Agent, DCIS

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 12TH DAY OF SEPTEMBER, 2013

The Honorable David H. Bartick
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, JAMES McWHIRTER, being duly sworn, depose and state as follows:

## AFFIANT

1.  I am a Special Agent with the Department of Defense, Office of Inspector General, Defense Criminal Investigative Service ("DCIS"), Long Beach Resident Agency. I have been so employed since May 2009. Prior to my employment with DCIS, I was a special agent with the U.S Postal Service Office of Inspector General for approximately two years and prior to that a special agent with the U.S. Army Criminal Investigation Command for approximately 10 years. In addition to my law enforcement experience, I was employed for approximately 9 years as an auditor for the Defense Contract Audit Agency. I have received specialized training in the investigation of various financial and white collar crimes and I have personally conducted or assisted in the investigation of violations of U.S. law to include bribery, kickbacks, public corruption, conspiracy, theft, money laundering, conflicts of interest, mail fraud and anti-trust violations. I have prepared numerous affidavits to support the establishment of probable cause for search and arrest warrants. I am familiar with the facts set forth below based upon my own investigative findings and conversations with other participating law enforcement agents.

## INTRODUCTION

2.  In conjunction with the United States Department of Justice ("DOJ"), the Naval Criminal Investigative Service ("NCIS"), the Defense Contract Audit Agency ("DCAA"), and colleagues from DCIS, I have been investigating, among other allegations, fraud and bribery allegations involving LEONARD GLENN FRANCIS ("FRANCIS") and his company, Glenn Defense Marine (Asia) ("GDMA"), which acts as a general contractor to the United States Navy.

1

As part of this investigation, agents are examining whether FRANCIS and GDMA committed fraudulent practices in the performance and billing of GDMA's contract to perform ship husbanding services to the U.S. Navy; whether things of value were improperly given to various U.S. Navy and other government personnel by FRANCIS and GDMA; and whether FRANCIS, GDMA, U.S. Navy and other government personnel have obstructed justice.

3. Based on the facts as set forth below in this affidavit, I respectfully submit that there is probable cause to believe that FRANCIS, a Malaysian citizen who lives in Singapore, and JOHN BERTRAND BELIVEAU II, an NCIS Supervisory Special Agent, have conspired to commit bribery, in violation of 18 U.S.C. § 371. Specifically, as set forth below, there is probable cause to believe that to promote and protect GDMA's business, FRANCIS agreed with BELIVEAU to offer, make and facilitate the making of the payment of things of value, including travel expenses, prostitutes, and money, to BELIVEAU in return for him violating his official and lawful duties by transmitting to FRANCIS sensitive information about NCIS criminal investigations into GDMA and FRANCIS, and their conduct in the performance of the ship husbanding contracts.

4. As defined by 18 U.S.C. § 3238, this offense was begun and committed on the High Seas or otherwise out of the jurisdiction of any particular district, and thus, venue is proper for this offense in the Southern District of California, as the District in which one or more joint offenders, namely FRANCIS, will be arrested in connection with this offense.

5. This affidavit is intended to demonstrate that there is probable cause to charge FRANCIS and BELIVEAU, and does not set forth all of my knowledge about this matter. The facts set forth in this affidavit are based upon my training and experience as well as my and members of the investigation's personal observations; review of documents; interviews of

witnesses; and review of physical evidence obtained during the course of this investigation. The documents obtained and reviewed include documents from the U.S. Navy submitted by or pertaining to GDMA; emails and email account information from U.S.-based email service providers, specifically including email accounts issued to FRANCIS, BELIVEAU, and other persons associated with the matters under investigation; information from BELIVEAU's government computers; information from U.S.-based credit reports, bank account and credit card information; and internal GDMA documents and emails; and telephone records. The investigation has also conducted forensic examinations of BELIVEAU's government computer.

## BACKGROUND

6. The U.S. Navy is a branch of the U.S. Department of Defense, whose mission is to maintain, train and equip combat-ready naval forces capable of winning wars, deterring aggression and maintaining freedom of the seas. The U.S. Navy Naval Supply Systems Command ("NAVSUP") is a command within the U.S. Navy, which is responsible for the global supply and delivery of goods and services to U.S. Navy personnel and warfighting assets. The U.S. Navy Fleet Logistics Centers ("FLC") are subordinate commands of NAVSUP located in various domestic and foreign locations and they provide logistics support for all naval installations and vessels operating in each location's area of responsibility. In particular, the NAVSUP FLC commands are responsible for the soliciting, awarding and overseeing contracts awarded to entities for goods and services, including ship husbanding, required by the U.S. Navy in each specific FLC's area of responsibility. NAVSUP FLC in Yokosuka, Japan ("FLC Yokosuka") supports naval installations and vessels operating in Japan, Hong Kong, and Russia. FLC Yokosuka also oversees the operations of a Detachment in Singapore ("FLC Singapore"),

which supports naval installations and vessels in foreign countries, including Singapore, Indonesia, the Philippines, Thailand, Cambodia, Vietnam, Australia, and elsewhere.

7. GDMA is a multi-national corporation with headquarters in Singapore and operating locations in other countries, including Japan, Singapore, Thailand, Malaysia, Korea, India, Hong Kong, Indonesia, Australia, Philippines, Sri Lanka and the United States. GDMA is owned and controlled by Leonard FRANCIS, who is the Chief Executive Officer/President of GDMA, and who oversees the daily business and operations of the company. FRANCIS is assisted by a core management team, consisting of persons known to the investigation and identified here by initials: HP, Vice President Worldwide Contracts; NP, Vice President Global Operations; and AW, General Manager Global Government Contracts. GDMA also employs Country Managers for each of its operating locations in foreign countries.

8. GDMA is a commercial and government contractor whose main business involves the "husbanding" of marine vessels, and as such, GDMA is known as a "husbanding service provider" ("HSP"). "Husbanding" involves the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when they arrive at port. Examples of items and services required by ships and submarines when in port include tugboats, fenders, port authority/custom fees, security, provisions (food), fuel, water, trash removal, collection holding and transfer of liquid waste ("CHT"), transportation, and many others.

9. Many of these items and services are supplied by lower tier subcontractors; however, GDMA does own a vast array of assets, including tug boats; water, trash, and CHT barges; docking equipment; small vessels for patrol (i.e. picket boats); passenger shuttles; security barriers; and other miscellaneous equipment it uses to fulfill husbanding requirements.

10. GDMA has been husbanding vessels for the U.S. Navy for over 25 years. In or about June 2011, NAVSUP awarded GDMA three regional contracts to provide husbanding services to U.S. ships and submarines at ports throughout Southeast Asia (Region 2), Australia and the Pacific Isles (Region 3), and East Asia (Region 4). The Region 4 contract is managed by FLC Yokosuka, and the Region 2 and Region 3 contracts are managed by FLC Singapore. By way of example, the Region 2 contract was structured as a first year base value of $25 million, which the U.S. Navy could opt to extend for up to four additional years, for a total base value of $125 million. Within each region, certain ports are more lucrative to GDMA than others. According to GDMA correspondence which I have reviewed, FRANCIS and GDMA employees referred to these ports as "Pearl Ports."

11. From April 2012 to present, JOHN BERTRAND BELIVEAU II ("BELIVEAU") has been assigned as the sole Supervisory Special Agent at NCIS Resident Agency, Quantico. BELIVEAU is a public official within the meaning of 18 U.S.C. § 201(a). BELIVEAU's responsibilities include providing oversight to approximately eight NCIS Special Agents, overseeing all NCIS Quantico-based investigations, and ensuring that the mission of NCIS is conducted successfully throughout the Quantico office's area of responsibility. As an NCIS Special Agent, BELIVEAU has specialized knowledge pertaining to covert communications, surreptitious movement of money, counter-surveillance, and other means of avoiding detection under the premises of law enforcement tradecraft practices. As an NCIS Special Agent, BELIVEAU also has access to the NCIS Knowledge Network ("K-NET"), an internal NCIS database containing NCIS unclassified investigative reporting. BELIVEAU has never been assigned to supervise or assist with a criminal investigation concerning GDMA, FRANCIS, or

any related person or entity. No part of the GDMA-related investigations has involved the NCIS Quantico office since BELIVEAU's assignment there.

12. From 2005 through 2008, BELIVEAU was assigned as a Protective Service Agent ("PSA") for the Commander, U.S. Navy 7th Fleet in Yokosuka, Japan. As a PSA, he served as the personal security advisor to the Commander, leading a team of executive protection specialists, coordinating all domestic and international travel, obtaining weapons clearances, and responding to emergencies or threats. From 2008 through April 2012, BELIVEAU was assigned as a "referent" stationed in Singapore, in which capacity he was responsible for meeting U.S. Navy ships and ensuring force protection. As a referent, he briefed the ships' commands on criminal, counterintelligence, and counterterrorism matters. A referent is also responsible for liaising with the host nation and its law enforcement. Emails obtained in this investigation show that, from November 2008 onward, BELIVEAU had regular contact with FRANCIS and other GDMA personnel.

13. Information that NCIS gathers related to an investigation is considered law enforcement sensitive, and may not be disclosed without authorization, or to anyone without a need to know that information. Indeed, each NCIS report contains a warning on the bottom of each page stating: "THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE CONTENTS. MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE." It is a violation of a Special Agent's official and lawful duties to disclose law enforcement sensitive information without authorization, or to anyone without a need to know that information.

## PROBABLE CAUSE THAT A CRIME HAS BEEN COMMITTED

### A. Prior NCIS Investigations Into GDMA

14. In May 2010, three U.S. Navy vessels visited Thailand as part of the Navy's Cooperation Afloat Readiness and Training ("CARAT") exercises, an annual series of exercises designed to enhance regional cooperation and strengthen professional skills among regional maritime partners. GDMA provided husbanding services for the Navy ships participating in the CARAT exercises. Prior to the 2010 CARAT exercises, the U.S. Navy and the Royal Thai Navy had agreed that U.S. Navy ships would not be charged dockage and wharfage fees in Thailand. Notwithstanding this agreement, in June 2010, GDMA submitted claims and invoices to the U.S. Navy for approximately $110,000 in dockage and wharfage fees. Based on a review of GDMA submissions, NCIS (Special Agent Sanz) opened an investigation on July 28, 2010 to examine possible violations of U.S. law in the submission of false claims for dockage and wharfage fees. As part of that investigation, Special Agent Sanz received and reviewed documentation, and interviewed personnel from the Royal Thai Navy.

15. According to documents I have reviewed, in or about early 2011, while posted in Singapore, BELIVEAU made travel arrangements to Bangkok, Thailand for March 4-6, 2011, through the travel agent that FRANCIS uses. Also according to documents I have reviewed, on or about March 3, 2011, FRANCIS emailed BELIVEAU a hotel reservation at the Dusit International Hotel in Bangkok, Thailand. A review of BELIVEAU's known bank and credit card records uncovered no evidence that BELIVEAU paid for either his travel or his hotel bill during this trip, nor did these documents show significant withdrawals of cash sufficient to reimburse FRANCIS for the costs. In addition, as an extra perquisite of this trip, FRANCIS arranged a female escort to entertain BELIVEAU. According to one email, attaching a picture of

this escort, FRANCIS asked: "Joyce your kinda Babe"? BELIVEAU replied "Nice. You bet. Hopefully I'm her kinda guy, hehe." Emails between the escort and FRANCIS show that FRANCIS made arrangements to pay for her three days' time, and her airfare, by wiring the funds to a bank account that the escort provided.

16. Shortly after this travel, in July 2011, BELIVEAU provided FRANCIS with law enforcement sensitive information about Agent Sanz's pending NCIS criminal investigation into GDMA. Emails show that BELIVEAU also specifically counseled FRANCIS about how to respond to Agent Sanz's inquiries pertaining to that investigation, as follows:

(a) On or about July 6, 2011, an email chain between leonard.glenn.francis@gmail.com (an account held by FRANCIS) and john.b.beliveau@gmail.com (an account held by BELIVEAU) discussed the NCIS CARAT investigation. One email in the chain to FRANCIS, from which the "FROM" line was deleted, stated: "Leonard, He [Agent Sanz] needs to attempt to interview GDMA as part of the investigation. Remember what we discussed regarding how [GDMA Vice President NP] can handle this? Let's talk." Based on the facts and patterns discovered in this investigation, I have reason to believe that this email came from BELIVEAU. Appended to this email was an email to GDMA from Special Agent Sanz requesting to interview relevant GDMA personnel. Based on this email exchange, I understand that BELIVEAU and FRANCIS had strategized previously on how GDMA should respond to the pending NCIS investigation, including specifically what answers GDMA Vice President NP should give if interviewed. (According to my review of documents, however, that interview never took place.)

(b) On or about July 8, 2011, FRANCIS emailed BELIVEAU asking: "What now another report from Kelly? A waste of time." Kelly was the Executive Director of FLC-

Yokosuka, and at times questioned charges submitted by GDMA. Attached to this email was an NCIS letter dated on or about June 16, 2011 to the Royal Thai Navy requesting documentation in relation to the U.S. Navy port visits during CARAT 2010 and 2011. BELIVEAU responded: "Hmmm, not sure. I'll know next week. It may be just finding out what the pattern of practice is such as costs. There isn't a new case so it is related to the open one. And, the Thais didn't give him all the documents before, so he needed to get all the data. Standard lead taskings." Based on these responses, I understand that BELIVEAU was providing FRANCIS information and counsel about Agent Sanz's investigation into GDMA.

17. It was a violation of BELIVEAU's official and lawful duties to disclose law enforcement sensitive information without authorization, or to anyone without a need to know that information.

18. In or about July 2010, NCIS began investigating fraud in the performance of GDMA's ship husbanding contract in Japan.

19. On or about October 4, 2011, BELIVEAU emailed FRANCIS: "How's it going. Back from the states yet. I lost my POC's [points of contact] in my cell so give me text when you are free if you want to get together, I have a couple of update reports on the Japan case for you. John." It was a violation of BELIVEAU's official and lawful duties to disclose law enforcement sensitive information without authorization, or to anyone without a need to know that information.

20. On December 3, 2011, FRANCIS sent an email to an associate, stating: "With NCIS there are two investigations one is Meble [the Country Manager of GDMA-Japan, a person known to the investigation and referred to here as EA] and his mess in Japan which we could defend a[s] a disgruntled sub con[tractor] who is stirring shit and same for Thailand the RTN

[Royal Thai Navy] Fraud case which both are hard to prove and charge. I have inside Intel from NCIS and read all the reports. I will show you a copy of a Classified Command File on me from NCIS ha ha." I am not aware of files maintained by NCIS entitled "Classified Command Files."

21. Shortly thereafter, on or about December 16, 2011, according to a review of BELIVEAU's access audit log, BELIVEAU conducted a search of K-NET looking for material relevant to the ongoing GDMA fraud investigations. Specifically, BELIVEAU executed approximately nine unique search queries in K-NET, each calculated to locate current NCIS reporting on cases involving GDMA. These queries included "glenn defense" and "4 glenn" – the number 4 being the subject code designation in K-NET for a fraud investigation.

22. According to an examination of the database, on or about March 27, 2012, BELIVEAU queried K-NET for all reporting in the Singapore NCIS office since February 26, 2012. Upon executing these queries, BELIVEAU downloaded to his computer six documents related to the investigation of GDMA in Japan.

    B.    **Current NCIS Investigation Into GDMA**

23. In the spring of 2012, NCIS initiated another investigation into GDMA to determine whether GDMA was overbilling the U.S. Navy through the creation and submission of fraudulent subcontractor bids and by other means.

24. According to government records, BELIVEAU transitioned into his new position at Quantico, Virginia in April 2012. From April 27 to May 1, 2012, the following emails were sent between BELIVEAU and FRANCIS:

Beliveau: "I will, but to be honest, you made a promise to help my situation.....two times and I haven't seen anything....I will always be your friend, but <u>you will get nothing else......until I get what you promise</u>.....You give whores more money than me ;) [Emphasis added]. "Don't get too busy that you forget your friends....Let me know....I can be your best friend or worst enemy....I am not an

|            |                                                                                                                                                                                                                     |
|------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|            | amateur.....I feel you are treating me that way....if you cannot help then say so..."                                                                                                                                |
| Francis:   | "You are a sore Bitch and I have not forgotten you Bro ☺ [H]ow do I send you a gift ☺."                                                                                                                              |
| Beliveau:  | "Oh my…not a sore bitch….,just gauge promises….I sent you before but you don't read…up to you…here it is PO Box 1863, Quantico, VA, 22134…I sent before…but if you cannot no worries…I know true issues when I know….take care" |
| Francis:   | "You are missing your Colombians, I can't send it via mail, how about Western Union"                                                                                                                                 |
| Beliveau:  | "Can, up to you…"                                                                                                                                                                                                    |
| Francis:   | "How shall we plan this as I don't want a trail leading to you...."                                                                                                                                                  |
| Beliveau:  | "Hmmmm…yeah…let me think about it…May be tough now that I'm not around. Let me check on how Western Union etc….keeps its records. Always better in person but tough now…"                                            |
| Beliveau:  | "What about a courier?"                                                                                                                                                                                              |
| Francis:   | "Fly to LAX [Los Angeles] or San D [San Diego] or LAX I am in SF [San Francisco] today"                                                                                                                              |

25. On May 7, 2012, BELIVEAU sent an email to FRANCIS stating: "Here is my new local number 703-341-7522… I can sms [text] you on your Sing[apore] number and vice versa free on my plan…JB".

26. On May 9, 2012, BELIVEAU again queried K-NET, searching for fraud reporting in the previous two months. No documents were downloaded on this occasion.

27. On June 5, 2012, BELIVEAU accessed K-NET, this time searching specifically for "Sanz" and "SNSN" (Singapore) and SNSN and Category 4. During this K-NET session, BELIVEAU downloaded 21 NCIS reports related to the GDMA investigations. Many of these reports detailed how GDMA may be defrauding the U.S. Navy through the use of fraudulent subcontractor bids from non-existent companies, or false bids from real companies. As set forth

in these reports, the husbanding contract awarded to GDMA in June 2011 contained fixed prices for a list of items, referred to as "line items," which a Navy ship entering port might need. The contract also contained procedures for GDMA to provide the ship with items for which the prices had not been fixed in advance in the contract (referred to as "non-line items"). According to the investigative reports viewed by BELIVEAU, GDMA was circumventing the requirements of its husbanding contracts and overbilling the Navy for non-line items including fuel, food, and incidental charges. These reports also described how GDMA justified its overcharges by creating fraudulent bids from fake or real companies which did not, in fact, submit a competitive bid. In doing so, GDMA, which also submitted a bid in nearly every instance, was able to win the award for these non-line items without the competition.

28. During the period from June 3 to June 9, 2012, BELIVEAU and FRANCIS exchanged a total of approximately 60 SMS [text] messages, 27 of which were exchanged on June 5, 2012 alone. According to AT&T Wireless, the content of those SMS messages was not saved on its network, and thus could not be retrieved because BELIVEAU used a pre-paid cellular telephone to call and text, and did not subscribe to the AT&T messages service.

29. The NCIS investigative reports viewed by BELIVEAU in June 2012 described extensive details on fraudulent quotes submitted by GDMA, and the methods used to create them.

30. According to my review of documents submitted to the U.S. Navy, beginning in June 2012, after BELIVEAU had viewed the NCIS investigative reports described above, and exchanged numerous text messages with FRANCIS, GDMA changed the method by which it submitted vendors' bids for non-line item services. Instead of providing a falsified quote on fabricated company letterhead, GDMA began submitting all the purported bids (or assertions of

unavailability) together on GDMA letterhead. For example, GDMA submitted three quotes in August 2012 for a trash barge, containers, and a gangway in anticipation of an upcoming Navy ship visit to Phuket, Thailand. All responses were on GDMA letterhead, submitted as one package. In each package, the two "competitive" quotes stated that the companies could not provide the requested service; only GDMA provided a bid. In each case, as before, GDMA was awarded the contract to provide the non-line item service.

31. Again on June 18, 2012, BELIVEAU accessed K-NET, searching for "Sanz and Glenn" as well as "oral wire intercept." In fact, on June 13, 2012, as part of this investigation, Special Agent Sanz had conducted consensual monitoring (which NCIS refers to as an "oral wire intercept") of one subject of the investigation. Agent Sanz's report on this event was not yet loaded into K-NET, however, and thus not located by BELIVEAU. BELIVEAU and FRANCIS exchanged 41 text messages on June 20, 2012, though, for the reasons described, the contents of those messages are unknown.

32. On August 17, 2012, BELIVEAU viewed several law enforcement sensitive NCIS criminal investigative reports on K-NET, including those related to the consensual monitoring event in June 2012, and those chronicling a recent NCIS investigation into whether a U.S. Navy Commander had improperly received things of value from GDMA and/or FRANCIS. These reports identified a witness who had been interviewed in this latter investigation, and noted that the witness had agreed to further assist law enforcement with the investigation by providing relevant emails, bank records, and credit card statements. On August 17, 2012, BELIVEAU and FRANCIS exchanged 22 text messages (contents unknown). In the months following these events, although the witness was initially eager to assist law enforcement with

this investigation, the witness stopped responding to agent telephone calls and ultimately refused to participate further in the ongoing NCIS investigation.

33. Less than a week after BELIVEAU accessed the NCIS case files regarding this Commander, on August 22, 2012, BELIVEAU emailed FRANCIS a forwarded email from a "nurse," whose email address is known to the investigation (referred to here as gxxxxxxxxx@yahoo.com"), and who has been identified as a Philippine national referred to here as GPA. In the cover email, BELIVEAU wrote to FRANCIS: "Leonard, Here is my nurse's address below. Her local cell is 63-xxxxxxxxxx [actual numbers omitted]. I'd like to get her a decent laptop with camera to [S]kype and something for her to use for work. She said there is Samsung for about 18K pesos. Not sure what can be had in Manila. Take care." FRANCIS replied: "Done Bro, my staff will handover or she collect V/R [very respectfully] Leonard Francis." BELIVEAU responded: "Thanks man, let me know how it goes. She is a good girl and didn't go whore the easy way like so many other greedy user bitches :)".

34. In an email dated September 5, 2012, GPA thanked BELIVEAU for the laptop and stated "I met this girl [] one of the employee of ur friend [F]rancis maybe his name because he has data on the computer -- I am so happy to receive presents from u... I didn't really expected that."

35. About two months later, on November 23, 2012 – the day after Thanksgiving, when nearly all of his colleagues were on annual leave -- BELIVEAU accessed K-NET once again and searched for reporting related to "glenn defense." At this time, BELIVEAU downloaded 42 law enforcement sensitive documents related to the current GDMA investigation. On or about November 23-24, 2012, BELIVEAU and FRANCIS exchanged 11 text messages, the contents of which are unknown.

36.     Also on November 23, 2012, BELIVEAU sent an email to himself containing a flight itinerary booked by "RMG TRAVEL PTE LTD." From other emails obtained in this investigation, I know that this is the Singapore-based travel agent used by FRANCIS. This three week, five-country itinerary contained the following flights:

01Dec12: Dulles International to New York

01Dec12: New York to Singapore

06Dec12: Singapore to Bangkok

11Dec12: Bangkok to Manila

16Dec12: Manila to Jakarta

16Dec12: Jakarta to Ninoy Aquino I Soekarno Hatta International (waitlisted)

21Dec12: Jakarta to Singapore

22Dec12: Singapore to New York

23Dec12: New York to Dulles International

37.     According to bank and credit card records of all known BELIVEAU accounts, there is no evidence that BELIVEAU paid for this trip. Nor is there evidence of cash withdrawals sufficient to reimburse FRANCIS for these flights. At this point the investigation only has evidence of the cost of one leg of this trip (the flight from Dulles to New York and New York to Dulles), which was $983. According to official leave records, BELIVEAU was on leave on December 3-25, 2012, and December 1-2, 2012 were BELIVEAU's scheduled days off.

38.     As the investigation into GDMA proceeded, BELIVEAU continued to query K-NET and download investigative reports related to the case. In addition to those instances described above, BELIVEAU accessed K-NET on January 24, 2013, querying "glenn marine"

and downloading five new relevant investigative reports. At the same time, between January 23-24, 2013, BELIVEAU and FRANCIS exchanged 36 text messages (contents unknown).

39. On or about April 9, 2013, BELIVEAU again accessed K-NET, and using the search term "glenn marine," he viewed 80 relevant NCIS investigative reports. According to a forensic computer examination, 76 of the 80 reports were downloaded to BELIVEAU's computer. After the 76 reports were saved, the compact disc burner was engaged. At the same time, on or about April 9, 2013, BELIVEAU and FRANCIS exchanged 21 text messages (contents unknown).

40. After downloading the files on or about April 9, 2013 BELIVEAU deleted from his computer all of the reports on the GDMA investigation that he had previously downloaded, with the exception of the files he had downloaded on or about November 23, 2012. Perhaps recognizing his oversight, on or about April 24, 2013, BELIVEAU deleted the remainder of the files from his computer. On the same date, BELIVEAU and FRANCIS exchanged 49 text messages (contents unknown).

41. On or about July 3, 2013, BELIVEAU accessed K-NET to examine an additional 16 NCIS files related to the GDMA investigation. Of those he viewed, BELIVEAU downloaded and saved seven NCIS reports onto his work computer. From on or about July 1, 2013 through July 4, 2013, BELIVEAU and FRANCIS exchanged 21 SMS messages (contents unknown).

42. On or about August 5, 2013, BELIVEAU accessed K-NET once again and searched for additional recent reporting related to GDMA. BELIVEAU viewed one record, which is a report from March 15, 2013, that he had previously downloaded. After terminating his K-NET session, as shown on surveillance video, BELIVEAU burned the seven reports he had previously saved to his work computer onto a CD. BELIVEAU then placed the CD among his

personal belongings in his briefcase, all of which he placed into the trunk of his car, which he then drove to his residence and parked in his garage. Between August 4 and August 6, 2013, BELIVEAU and FRANCIS exchanged 37 text messages (contents unknown).

43. Taken together, despite never having been assigned to participate in any manner in an NICS investigation involving GDMA, between December 16, 2011 and August 5, 2013, BELIVEAU gained access to K-NET on 13 occasions, over which he executed 35 unique search queries for information relating to GDMA and FRANCIS, using a variety of search terms, including: Category 4 [fraud investigations], glenn defense, snsn, sanz, glenn marine, roi [report of interview], interim glenn defense, s/glenn, glenn, investigative action 4l, investigative action 4l feyk, sanz and glenn, and oral wire intercept. Based on these searches, BELIVEAU displayed 221 documents which contained one or more of the search terms. According to a forensic examination of BELIVEAU's government computer, BELIVEAU saved 125 of those NCIS investigative reports to his government computer on or about November 23, 2012, January 24, 2013, April 9, 2013, and July 3, 2013. After many of these downloads, the CD burner was engaged, and based on my training and experience, as well as the download and CD burn on August 5, I believe that BELIVEAU burned each set of these investigative reports to CDs so that he could easily transport them out of the NCIS office space.

44. According to telephone records that I have reviewed, from May 6, 2012 through August 6, 2013, FRANCIS and BELIVEAU exchanged approximately 1146 SMS messages, of which approximately 159 occurred on the day before, day of, and day after BELIVEAU accessed K-NET and downloaded GDMA-related investigative reports. None of the content of these messages was available from the service provider. (In addition, there were a number of dates not

associated with the K-NET access and downloading of files on which BELIVEAU and FRANCIS exchanged a high volume of SMS messages.)

45. We do not have direct proof that BELIVEAU gave FRANCIS the downloaded NCIS reports or other information from K-NET, but based on the searches of K-NET, downloads of investigative information, contemporaneous CD burns, text message activity, the surveillance on August 5, 2013, and BELIVEAU's email to FRANCIS on October 4, 2011, offering update reports on the Japan case, I believe that BELIVEAU transmitted law enforcement sensitive information to the target of that investigation.

46. Based on the evidence above, I believe that BELIVEAU received and requested things of value from FRANCIS including the following: travel, hotel and prostitute services (March 2011); a "gift" arranged in April 2012; a laptop for BELIVEAU's girlfriend (September 2012); and a three-week trip through five countries in Asia (December 2012).

47. On September 9, 2013, at about 5:50 pm, BELIVEAU accessed K-NET and conducted a search relating to the ongoing investigation. BELIVEAU reviewed four investigative reports relating to GDMA. It is anticipated that FRANCIS will be traveling to the United States for a meeting with U.S. Navy officials on September 16, 2013.

## CONCLUSION

48. Based on the foregoing, I respectfully submit that there is probable cause to believe that LEONARD GLENN FRANCIS and JOHN BERTRAND BELIVEAU II, an NCIS Supervisory Special Agent and public official, have engaged in a conspiracy to commit bribery, in violation of 18 U.S.C. § 371, by agreeing that FRANCIS would offer, make and facilitate the making of the payment of things of value, including travel expenses, prostitutes, and money, to BELIVEAU in return for him violating his official and lawful duties by transmitting to

FRANCIS sensitive information about NCIS criminal investigations into GDMA and FRANCIS, and their conduct in the performance of the ship husbanding contracts. Therefore, I respectfully request that arrest warrants issue for Leonard FRANCIS and John BELIVEAU.

I further request that the complaint, affidavit, arrest warrants, and all related documents be placed under seal until further order of the Court.

Respectfully submitted,

James McWhirter
Special Agent
Defense Criminal Investigative Service

Subscribed and sworn to before me
On September 12, 2013

_____
THE HONORABLE DAVID H. BARTICK
UNITED STATES MAGISTRATE JUDGE